FILED

2021 Aug-27  PM 04:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ERIC CISNEY, et al.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:18-CV-1148-MHH** |
| | } | |
| **ROBERT GREY JOHNSON, JR.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case concerns an attorney's effort to recover a fee from his former clients' settlement funds.  After being injured in a car accident in California, Eric Cisney sought damages from the driver at fault.  His California attorney, Robert Johnson, also pursued underinsured motorist benefits from Mr. Cisney's insurer. Before the UIM claim was resolved, Mr. Cisney changed lawyers.  When Mr. Cisney and his wife settled their UIM claim, Mr. Johnson asserted an attorney lien on the UIM settlement funds based on his contingency fee agreement with Mr. Cisney.  The Cisneys argue that Mr. Johnson is not entitled to fees for his efforts in the UIM case, and they request a declaration that Mr. Johnson cannot recover fees from the disputed settlement funds.  The Cisneys have asserted several claims against Mr. Johnson based on his efforts to take a portion of the UIM settlement fund.  Mr.

1

Johnson has filed counterclaims against the Cisneys to try to recover a fee from the UIM settlement fund.  This case is before the Court on the parties' cross-motions for summary judgment.

**SUMMARY JUDGMENT STANDARD**

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record."  FED. R. CIV. P. 56(c)(3).  When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018).

"In practice, cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material

fact exist." *Georgia State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (internal quotation marks and brackets omitted) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983)).   "'The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" *Alabama Mun. Ins. Corp. v. Scottsdale Ins. Co.*, 297 F. Supp. 3d 1248, 1252 (N.D. Ala. 2017) (quoting *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242–43 (N.D. Ga. 2014)) (citing in turn *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)).   A district court will not grant summary judgment when the parties file cross-motions for summary judgment "unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).

## SUMMARY JUDGMENT EVIDENCE AND CASE PROCEEDINGS

In California, on July 17, 2015, plaintiff Eric Cisney, a firefighter, was severely injured when a firetruck in which he was riding was struck by Nester Jacobo Rosales.  (Doc. 110, pp. 16, 27; Doc. 112, pp. 52, 60).  Mr. Cisney required medical treatment, and he was unable to work.  A portion of Mr. Cisney's medical expenses

and a portion of his lost earnings were covered by workers compensation benefits. (Doc. 110, pp. 27, 47).  Mr. Cisney hired defendant Robert Johnson, an attorney in California, "to prosecute a claim for an accident which occurred on 7/17/15."  (Doc. 110, pp. 9, 14).  Mr. Cisney acknowledges that he hired Mr. Johnson to pursue workers compensation benefits and a third-party tort claim.  (Doc. 112, p. 60).

On September 29, 2015, Mr. Cisney signed a contingency fee agreement with Mr. Johnson.  (Doc. 110, pp. 9–12).  Mr. Cisney signed the fee agreement in Huntsville, Alabama.  (Doc. 110, p. 12; Doc. 112, p. 53).  Under the agreement, Mr. Johnson was entitled to 33% of monies recovered by settlement, arbitration, or judgment "against the responsible parties," and Mr. Johnson could be entitled to up to 40% in certain circumstances.  (Doc. 110, p. 9).  Mr. Johnson reserved the contractual right to assert a fee lien against a potential recovery.  The fee agreement states:

> Attorney shall have a lien for his fees against any future recovery by Client in this matter, and said lien shall have priority over all other potential and future liens. Client acknowledges that this contingent fee is not set by law, but has been negotiated between Attorney and Client.

(Doc. 110, p. 9).  The agreement permitted Mr. Cisney to substitute another attorney for Mr. Johnson at any time, but Mr. Johnson would retain an attorney's lien, which would be "satisfied upon the resolution of the case by the new attorney . . . from the fees paid to the new attorney on the case."  (Doc. 110, p. 11).  The agreement states that if Mr. Cisney were to substitute another attorney for Mr. Johnson, Mr. Cisney

4

would pay Mr. Johnson $350 per hour "for time expended on the case up to the time of any discharge." (Doc. 110, p. 11). The agreement does not contain a choice of law provision.

The day after Mr. Cisney signed the contingency fee agreement, Mr. Johnson's associate, Robert Rankin, emailed a letter to Metlife Auto & Home concerning Mr. Cisney's accident. (Doc. 110, p. 14). Mr. Rankin notified Metlife that his firm was representing Mr. Cisney "with regard to injuries he sustained in an automobile accident on July 17, 2015." (Doc. 110, p. 14). The Cisneys had an auto insurance policy with MetLife. (Doc. 111, p. 16).

Two weeks later, Mr. Rankin emailed a letter to Foremost Insurance. (Doc. 110, pp. 16–17). In the letter, he advised Foremost that he represented Mr. Cisney; that Mr. Cisney had been injured in a collision with Nestor Rosales while Mr. Rosales was working for his employer; and that the vehicle that Nestor Rosales was operating at the time of the collision was owned by Jesus Rosales and insured by Foremost. Mr. Rankin asked Foremost to disclose its policy limits for Jesus Rosales's policy. (Doc. 110, p. 16). On January 19, 2016, Mr. Rankin emailed a demand letter to Foremost and offered to settle Mr. Cisney's claim for $50,000, the limit of Jesus Rosales's policy. (Doc. 110, pp. 19–20).

After sending several additional settlement letters to Foremost, (Doc 110, pp. 22–31), on April 15, 2016, Mr. Rankin notified Mr. Cisney by email that Foremost

had agreed to settle the third-party claim for "$50k, the policy limit on the vehicle." (Doc. 110, p. 33).   Mr. Rankin asked Mr. Cisney and Mrs. Cisney to sign the settlement agreement attached to the email message and explained:  "now we can make an under-insured claim on your own policy."  (Doc. 110, p. 33).   Under the settlement, Mr. Cisney released all claims against Jesus Rosales.  (Doc. 110, p. 35). Mr. Cisney and Mrs. Cisney signed the settlement agreement in Huntsville, Alabama on April 15, 2016.  (Doc. 110, p. 36).[1]

In May of 2016, Mr. Rankin submitted to Metlife a claim for underinsured motorist benefits under the Cisneys' automobile insurance policy.  (Doc. 110, p. 44; Doc. 111, p. 18, ¶ 22).   Metlife found "coverage issues" with the claim because, under their policy, the Cisneys had to obtain Metlife's permission before settling with a third-party tortfeasor like Mr. Rosales.  (Doc. 110, p. 46; Doc. 111, p. 17, ¶ 21).   In a letter to Metlife's Lisa Boyes, Mr. Rankin explained that the Cisneys pursued settlement with Foremost before seeking UIM benefits because "under California law, it is mandated that the plaintiff insured 'exhaust the entire available insurance proceeds' from the defendant at fault as a prerequisite to even being 'eligible' for additional UIM compensation."  (Doc. 110, p. 46).   Mr. Johnson and

---

[1] Foremost sent the $50,000 settlement payment to Mr. Johnson's firm on May 13, 2016.  (Doc. 110, p. 42).  Mr. Johnson's firm did not immediately release the settlement funds to Mr. Cisney because Mr. Rankin was negotiating with the California State Compensation Insurance Fund or SCIF, Mr. Cisney's employer's workers compensation carrier, to reduce the Fund's approximately $44,000 indemnity claim against the $50,000 settlement.  (Doc. 110, p. 44; Doc. 111, pp. 8, 64).

Mr. Rankin negotiated with Foremost and MetLife to redo the third-party settlement and obtain Metlife's permission to settle.  (Doc. 111, pp. 2–11).  Mr. Rankin requested Metlife's permission to settle on July 7, 2016.  (Doc. 111, pp. 8–9).

Meanwhile, on June 14, 2016, Metlife filed a lawsuit against the Cisneys in federal court in Alabama, seeking a declaration that the company had no duty to pay the Cisneys UIM benefits because the Cisneys did not request Metlife's permission to settle with the third-party tortfeasor.  (Doc. 111, pp. 13–20); *see also Metro. Prop. and Cas. Ins. Co. v. Cisney et al*, 5:16-cv-00973-MHH (N.D. Ala. 2016).  A few months later, Mr. Johnson filed a lawsuit for the Cisneys in California state court. In their complaint, the Cisneys named Metlife, SCIF, and Jesus Rosales as defendants and asserted contract and tort claims against them.  (Doc. 111, pp. 22–47).  The California state court transferred the Cisneys' action to Alabama.  (Doc. 112, p. 60).

Eventually, the Cisneys agreed to arbitrate the UIM coverage claim with Metlife.  (Doc. 111, p. 61).  Before the arbitration, Mr. Johnson negotiated a "high-low" binding agreement for the arbitration.  (Doc. 112, pp. 14, 60).  This agreement guaranteed the Cisneys a minimum recovery of $100,000 and a maximum recovery of $500,000.  (Doc. 112, p. 60).

On August 1, 2017, before the arbitration began, Mr. Cisney terminated Mr. Johnson's representation and hired attorney Jerry Blevins.  (Doc. 111, p. 66).  On

August 24, 2017, "in accordance with the terms of the written fee agreement," Mr. Johnson sought a lien on any arbitration award in favor of the Cisneys. (Doc. 112, p. 2). The notice was not filed in court.

The Cisneys settled with Metlife in September of 2017. (Doc. 112, pp. 6–11). Metlife agreed to pay the Cisneys $500,000. The payment was directed to Mr. Blevins for disbursement to the Cisneys. (Doc. 112, p. 6). The written release required the Cisneys and Mr. Blevins "to satisfy all liens, of whatever type, and subrogation claims from settlement proceeds." (Doc. 112, p. 7). The Cisneys agreed to indemnify and defend Metlife from all claims brought by an attorney for attorney's liens. (Doc. 112, pp. 7–8).

Shortly after the parties signed the settlement documents, Mr. Johnson sent a notice to Mr. Blevins regarding his fee lien and enclosed an itemized summary of the hours he worked on Mr. Cisney's case. (Doc. 112, pp. 13–17). Citing California law, Mr. Cisney argued that his lien had priority over any fee lien Mr. Blevins may have against the Cisneys' settlement with Metlife because he (Mr. Johnson) had helped negotiate the "high-low" agreement with Metlife before the arbitration. (Doc. 112, pp. 13–14). Mr. Johnson demanded that Mr. Blevins refrain from releasing the funds from the Metlife settlement until Mr. Johnson's lien was resolved. (Doc. 112, p. 14). Mr. Johnson claimed a total of $175,338 for his lien, which included hourly fees and a contingency fee. (Doc. 112, p. 17).

On behalf of the Cisneys, Mr. Blevins filed a complaint against Mr. Johnson and Mr. Rankin in the Circuit Count of Montgomery County. (Doc. 1-1). After the Cisneys voluntarily dismissed their claims against Mr. Rankin, (Doc. 1, p. 1), Mr. Johnson removed the case to the United States District Court for the Middle District of Alabama, (Doc. 1). The United States District Court for the Middle District of Alabama transferred the matter to this district. (Doc. 26).

Shortly after the case arrived in this district, the Cisneys replaced Mr. Blevins as their counsel, (Doc. 32), and the Court ordered Mr. Blevins to deposit with the Court the disputed proceeds of the Metlife settlement, (Doc. 33). Mr. Blevins deposited the sum of $175,422.09 with the Court. (Doc. 34-1).

The Cisneys' new attorney filed an amended complaint on their behalf. (Doc. 47-2). Pending before the Court are the Cisneys' claims against Mr. Johnson for a declaratory judgment that he is not entitled to a fee from the Metlife settlement funds, conversion, outrage, wantonness, and legal malpractice and Ms. Cisney's claim against Mr. Johnson for interference with a business or contractual relationship. (Doc. 47-2, pp. 3–13). Mr. Johnson answered the amended complaint and filed counterclaims against the Cisneys for breach of contract, fraud, negligence or wantonness, conversion, and civil conspiracy. (Doc. 83, p. 12–17).

The Cisneys seek judgment in their favor as to their claims for declaratory relief and conversion. (Doc. 107). The Cisneys have not moved for summary

judgment on Mr. Johnson's counterclaims.  Mr. Johnson seeks summary judgment on the Cisneys' claims for declaratory judgment, conversion, wantonness, and legal malpractice.  (Doc. 105).  Mr. Johnson did not move for summary judgment on the Cisneys' claims against him for outrage or on Ms. Cisney's claim against him for intentional interference with a business or contractual relationship.  (Doc. 47-2, pp. 8–9, ¶¶ 41–54).

**ANALYSIS**

## I.    DECLARATORY JUDGMENT

In their request for declaratory relief, the Cisneys have asked the Court to determine what state law governs the contingency fee agreement between Mr. Cisney and Mr. Johnson, the appropriate jurisdiction and venue for this matter, and the parties' entitlement to the disputed $175,422.09 from the Metlife settlement fund.  (Doc. 47-2, p. 5).  The Court already has concluded that this judicial district is the proper forum for this action.  (Docs. 26, 72).  The jurisdictional and choice of law questions are straightforward.  The Court answers them before turning to the heart of the parties' disagreement – the disputed settlement funds.

### Subject Matter Jurisdiction

This case is properly in federal court under diversity jurisdiction.  28 U.S. § 1332.  For federal jurisdiction to exist under 28 U.S.C. § 1332(a), there must be complete diversity of citizenship, and the amount in controversy must exceed

$75,000.00, exclusive of interest and costs.  28 U.S.C. § 1332(a); *Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1085 (11th Cir. 2012).  "Jurisdictional facts are assessed on the basis of plaintiff's complaint *as of the time of removal*."  *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1097 n.13 (11th Cir. 1994) (emphasis in *Burns*).

There is complete diversity of citizenship between the original parties in this case because the Cisneys are citizens of Alabama, and Mr. Johnson and Mr. Rankin, who the Cisneys initially named as a defendant, are citizens of California.  (Doc. 1-1, p. 1, ¶¶ 1–4).[2]  The amount in controversy requirement is met because the parties seek a declaratory judgment resolving the parties' claims regarding more than $75,000 in disputed attorney's fees.  *See Federated Mut. Ins. Co. v. McKinnon Motors*, 329 F.3d 805, 807 (11th Cir. 2003) (quoting *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1077 (11th Cir. 2000)) ("When a plaintiff seeks injunctive or declaratory relief, the amount in controversy is the monetary value of the object of the litigation from the plaintiff's perspective.").

---

[2] In their original complaint, the Cisneys alleged their and the defendants' state of residency rather than the parties' states of domicile.  The record reflects that the Cisneys are domiciled in Alabama, and Mr. Johnson and Mr. Rankin are domiciled in California.  *See* 28 U.S.C. § 1332; *see also Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994) ("Citizenship, not residence, is the key fact that must be alleged . . . to establish diversity for a natural person."); *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013) (stating that domicile requires both residence in a state and an intention to remain there indefinitely).

**Choice of Law**

Because this Court has diversity jurisdiction, Alabama substantive law, including conflict of law principles, applies in this case. *See Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009); *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Under Alabama law, courts follow the *lex loci contractus* rule unless a contract contains a choice of law provision. *See also Cherokee Ins. Co., Inc. v. Sanches*, 975 So. 2d 287, 292 (Ala. 2007) (citation omitted).  The *lex loci contractus* rule requires courts to use the substantive law of the state in which the contract was formed unless that law is contrary to Alabama's fundamental public policy. *Cherokee Ins. Co., Inc.*, 975 So. 2d at 292.  A contract is formed where there is a valid offer, an acceptance, consideration, and mutual assent to the essential terms of the contract. *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009).  A signature on a contract is evidence of the parties' mutual assent to be bound by the terms of the contract. *Ex Parte Rush*, 730 So. 2d 1175, 1177–78 (Ala. 1999).  "[T]he general conflict of laws rule provides that the law of the state wherein the contract was executed is determinative of the rights and liabilities of the parties to the contract." *Harrison v. Insurance Co. of N.A.*, 318 So. 2d 253, 257 (Ala. 1975); *Industrial Chem. & Fiberglass Corp. v. North River Ins. Co.*, 908 F.2d 825, 829 n. 3 (11th Cir. 1990) ("Because the North River policy contains no choice of law

12

provision, we must look to the choice of law rules of the forum state, Alabama, to determine the applicable law. Alabama's choice of law rule provides that the law of the state wherein the contract was executed shall govern interpretation of the contract.") (citations omitted).

The contingency fee agreement between Mr. Johnson and Mr. Cisney does not contain a choice of law provision. (Doc. 110, pp. 9–12; Doc. 72). Mr. Cisney signed the contingency fee agreement—and, therefore, accepted Mr. Johnson's offer to represent him—in Huntsville, Alabama. (Doc. 110, p. 12; Doc. 112, p. 53, ¶ 7). At that point, all elements of a valid contract were satisfied, and the contract for representation was formed. Thus, Alabama law governs the interpretation of the contingency fee agreement.[3]

### Entitlement to Disputed Settlement Funds

On the record before the Court, the Court can narrow the discussion regarding entitlement to the disputed $175,422.09, but the Court cannot declare yet who should recover the funds. Here's why.

Mr. Johnson has asserted a right to a portion of the Metlife settlement fund under several theories, one of which is breach of the terms of his contingency fee

---

[3] In his interrogatory responses, Mr. Cisney describes the contingency fee agreement as a California agreement. (Doc. 112, p. 61, ¶ 5). Choice of law issues are questions of law for a court to resolve. Mr. Cisney's assertion that the contingency fee agreement is a California contract is inconsistent with Alabama law. Therefore, the Court disregards Mr. Cisney's assertion.

agreement with Mr. Cisney.  (Doc. 83, pp. 12–13; *see also* Doc. 112, p. 2).  The parties have explained their positions with respect to Mr. Johnson's breach of contract claim, so the Court may evaluate that claim on the record before it.

If the terms of the contingency fee contract are certain and clear, then the court must "determine the meaning of those terms."  *Ex Parte Counts*, 683 So. 2d 968, 970 (Ala. 1996) (citing *Johnson v. Cervera*, 508 So. 2d 257, 259 (Ala. 1987)).  Sometimes, the terms of a contract are not clear.  A contractual term is ambiguous "if it is reasonably susceptible of more than one meaning."  *FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc.*, 914 So. 2d 344, 357 (Ala. 2005); *see also Winkleblack v. Murphy*, 811 So. 2d 521, 525 (Ala. 2001) (citation omitted).  A court must determine whether contractual terms are ambiguous.  *Ex Parte Counts*, 683 So. 2d at 970.  If a contractual term is ambiguous, then "the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it."  *Safeway Ins. Co. of Alabama v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005).

With these legal standards in mind, the Court turns to the language of the agreement between Mr. Cisney and Mr. Johnson.  The pertinent portion of the contingency fee agreement states that Mr. Cisney:

> employ[ed] the legal services of ROBERT G JOHNSON, JR., Attorney at Law, (hereinafter "Attorney") in order to prosecute a claim for an accident which occurred on 7/17/2015.  Attorney shall be compensated for his services by means of Contingency Agreement, whereby he is

14

> paid Thirty-Three and One-Third Percent (33%) of the gross monies
> recovered by settlement, arbitration, or judgment in his representation
> of Client's claim against the responsible parties.

(Doc. 110, p. 9).  Though this provision does not specifically identify the responsible

parties against whom (or which) Mr. Johnson would bring a claim on Mr. Cisney's

behalf, the phrase "responsible parties" is not ambiguous.  Nestor Rosales was the

party who was responsible for Mr. Cisney's July 17, 2015 accident.  Metlife may

have had a contractual obligation to Mr. Cisney in the event of an accident with an

uninsured motorist, but Metlife does not qualify as a party responsible for the

collision in California in which Mr. Cisney was injured.

Thus, under the plain and unambiguous language of the contingency fee

agreement between Mr. Cisney and Mr. Johnson, Mr. Johnson is not entitled to a fee

lien against the Cisneys' settlement with Metlife, and the Cisneys have no obligation

to pay Mr. Johnson fees under the contingency fee contract between Mr. Cisney and

Mr. Johnson.[4]  Mr. Johnson has emphasized that he is not seeking a lien against the

---

[4] In his counterclaim, Mr. Johnson alleges that the Cisneys "entered into a legal, valid, and binding contract" with him and that "[s]aid contract necessarily included any and all claims of Kerri Cisney, as her claims were derivative of the claims of Eric Cisney."  (Doc. 83, p. 12, ¶ 14).  Mr. Johnson executed a contingency fee contract with Mr. Cisney; Mrs. Cisney is not a party to the contract.  (Doc. 110, pp. 9–12).  It is true that Mr. Johnson decided to include Mrs. Cisney in the Foremost settlement when he redid the settlement to avoid a breach of the Metlife policy under which he decided to seek UIM benefits, but he did so in an effort to minimize the indemnity claim that Mr. Cisney's employer's carrier was asserting against the Foremost settlement.  (Doc. 111, pp. 8, 11).  Mr. Johnson included Mrs. Cisney as a plaintiff in the action that he filed in California after Metlife sued Mr. and Mrs. Cisney in Alabama for declaratory judgment, but there is no evidence in the record that Mrs. Cisney signed a contingency agreement with Mr. Johnson or otherwise authorized him to act on her behalf.  The record indicates that Mr. Johnson communicated only with Mr. Cisney.  (Doc. 111, pp. 59, 61, 63).

Metlife settlement fund under Alabama's attorney lien statute, ALABAMA CODE § 34-3-61(b).  (Doc. 106, p. 19).  Therefore, the Court declares that Mr. Johnson may not enforce an attorney lien against the Metlife settlement fund.

The Cisneys contend that Mr. Johnson converted or interfered with the UIM settlement fund by asserting a lien against the fund.  Alabama follows the Second Restatement of Torts for trespass to chattel, which states:

> One who commits a trespass to a chattel is subject to liability to the possessor of the chattel if, but only if,
>
>> (a) he dispossesses the other of the chattel, or
>> (b) the chattel is impaired as to its condition, quality, or value, or
>> (c) the possessor is deprived of the use of the chattel for a substantial time, or
>> (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest

Restatement (Second) of Torts, § 218 (1965).  Dispossession is the "taking of a chattel from the possession of another without the other's consent." Restatement (Second) of Torts, § 221. Conversion of chattel is closely related to trespass to chattel, but conversion "requires a more extensive interference with the plaintiff's possession." *Poff v. Hayes*, 763 So. 2d 234, 239 (Ala. 2000).   "To constitute conversion, there must be a wrongful taking or wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse of another's property." *Greene County Bd. of Educ. v. Bailey,* 586 So. 2d 893, 898 (Ala. 1991) (citing *Ex parte SouthTrust Bank of Alabama, *1153 N.A.,* 523 So. 2d 407 (Ala.

1988)).  "The gist of the action [for conversion] is the wrongful exercise of dominion over property to the exclusion of or in defiance of a plaintiff's rights, where the plaintiff has a general or special title to the property or the immediate right to possession."  *Bailey,* 586 So. 2d at 898.

Here, Mr. Johnson has not committed conversion by asserting a lien on the disputed fees.  Mr. Johnson has not had possession of the settlement funds because Mr. Blevins withheld $351,888 from the Metlife settlement fund for his fee and Mr. Johnson's fee, (Doc. 47-2, p. 4, ¶¶ 19–20; Doc. 47-2, p. 7, ¶ 37), and the Court ordered Mr. Blevins to deposit into the Court's registry the sum that Mr. Johnson claims, $175,422.09, (Doc. 33).  Mr. Blevins complied with the Court's order.  (Doc. 34).  The Court has maintained the $175,422.09 deposit; Mr. Johnson has not taken possession of the funds.  Therefore, the Cisneys cannot recover the $175,422.09 deposited with the Court under a theory of conversion.

In his counterclaim, Mr. Johnson asserts that he is entitled to recover fees under a variety of tort theories.  (Doc. 83, pp. 13–17).  The Cisneys have not moved for judgment in their favor on those claims.  Therefore, it is premature for the Court to declare to whom the $175,422.09 in the Court's registry should be paid.

## II.   WANTON CONDUCT

"'Wantonness' is the conscious doing of some act or the omission of some duty under the knowledge of the existing conditions, and conscious that from the

doing of such act or omission of such duty, injury will likely or probably result." *Kilcrease v. Harris*, 259 So. 2d 797, 801 (1972).  A plaintiff does not need to prove that the defendant intended to injure her to prevail on a claim for wantonness under Alabama law.  *See Burns v. Moore*, 494 So. 2d 4, 5 (Ala. 1986).

The Cisneys allege as follows with respect to their wantonness claim against Mr. Johnson:

> Johnson and Blevins consciously and knowingly engaged in the misconduct complained above and/or consciously failed to carry out their duties, including fiduciary, ethical and legal obligations and duties, under the knowledge of the existing conditions and laws and all the meanwhile knowing that their actions and misconduct would likely injury and damage the plaintiffs

(Doc. 47-2, p. 10, ¶ 56).  The conduct to which the Cisneys refer seems to be Mr. Johnson's assertion of a fee lien and Mr. Blevins's effort to withhold from the Metlife settlement fund the $175,422.09 that Mr. Johnson claimed as a fee until Mr. Johnson's effort to impose a lien against the UIM settlement was resolved.

The record does not indicate that Mr. Johnson was reckless in seeking a fee for the work that he performed in trying to obtain UIM benefits under the Cisneys' policy.  For a variety of reasons, Mr. Johnson may not be entitled to a fee, but the record does not suggest that he was reckless in seeking a fee.  Mr. Blevins believed that there was a colorable question as to Mr. Johnson's entitlement to a fee, so he, with the Cisneys' permission, withheld $175,422.09 from the Metlife settlement fund until Mr. Johnson's fee dispute could be resolved.

If the Cisneys are attempting to assert other types of wanton conduct, their allegations are too vague to survive Mr. Johnson's summary judgment motion. Therefore, the Court will enter judgment for Mr. Johnson on the Cisneys' wantonness claim.

### III.   LEGAL MALPRACTICE

The Cisneys assert a claim for legal malpractice against Mr. Johnson under the Alabama Legal Services Liability Act for his representation in the UIM claim. The Alabama Legislature enacted the Alabama Legal Services Liability Act to address a "crisis threaten[ing] the delivery of legal service to the people of Alabama." ALA. CODE § 6-5-570.  The ALSLA provides a "complete and unified approach to legal actions against legal service providers," and it is the "only one form and cause of action against legal service providers in courts in the State of Alabama." ALA. CODE § 6-5-573.

Though he is not licensed in Alabama and has never appeared in Alabama *pro hac vice*, Mr. Johnson is a legal services provider covered by the ALSLA.  Under the statute, a legal service provider is "[a]nyone licensed to practice law by the State of Alabama or engaged in the practice of law in the State of Alabama." ALA. CODE § 6-5-572(2); *see also Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So. 2d 800, 803 (Ala. 1999) ("The language of the ALSLA makes it clear that Act refers to actions against 'legal service providers' alleging breaches of their duties in

providing legal services. Conversely, from a plaintiff's perspective, the ALSLA applies to any claim originating from his receipt of legal services.").  Mr. Johnson engaged in the practice of law when he associated with the Balch & Bigham firm to litigate the UIM claim, provided advice to Mr. Cisney about legal strategy with respect to UIM benefits, and negotiated the "high-low" arbitration agreement with Metlife.  (Doc. 111, pp. 59, 61, 63–64; Doc. 112, pp. 13–17).

A plaintiff may bring an action for damages in contract and in tort against a legal services provider if the provider breaches the standard of care, which is defined as "such reasonable care and skill and diligence as other similarly situated legal service providers in the same general line of practice in the same general area ordinarily have and exercise in a like case."  ALA. CODE § 6-5-580.  "To prevail in a legal-malpractice action, the plaintiff must prove that, but for the attorney's negligence, the legal matter concerning which the attorney is alleged to have been negligent would have been resolved more favorably to the plaintiff."  *Bonner v. Lyons, Pipes & Cook, P.C.*, 26 So. 3d 1115, 1120 (Ala. 2009); *see also Pickard v. Turner*, 592 So. 2d 1016, 1020 (Ala. 1992) ("Generally, actionable [legal] malpractice cannot be established in the absence of a showing that the attorney's wrongful conduct has deprived the client of something to which he would otherwise have been entitled.") (citation omitted).

Here, the record viewed in the light most favorable to the Cisneys shows that Mr. Johnson and Mr. Rankin did not exercise the reasonable care and skill and diligence that other similarly situated legal service providers in the same general line of practice would have used in representing Mr. Cisney.  Mr. Johnson failed to meet the applicable standard of care because he failed to obtain permission from Metlife before he settled Mr. Cisney's third-party tortfeasor claim as required by the Cisneys' auto insurance policy.  (Doc. 110, p. 46; Doc. 111, p. 17, ¶ 21).[5]  The record shows that Mr. Johnson and Mr. Rankin were aware of Mr. Cisney's potential UIM claim early on because the day after Mr. Cisney signed the contingency agreement with Mr. Johnson, Mr. Rankin emailed a letter to Metlife advising Metlife that he and Mr. Johnson were representing Mr. Cisney "with regard to injuries he sustained in an automobile accident on July 17, 2015."  (Doc. 110, p. 14).  Mr. Rankin and Mr. Johnson's failure to read the policy and understand the implications of their initial settlement with Foremost jeopardized a potential UIM claim for the Cisneys.

Because they did not understand the terms of Mr. Cisney's Metlife automobile insurance policy, Mr. Johnson and Mr. Rankin had to take several additional steps to finalize the Foremost settlement for $50,000, and they had to persuade Metlife to arbitrate Mr. Cisney's claim for UIM benefits.  Though the situation could have

---

[5] The insurance policy is not contained in the record, so the Court refers to letters from Mr. Johnson's law firm to representatives of Metlife regarding the Cisneys' UIM claim and Metlife's allegations in its complaint from the June 2016 lawsuit.  (Doc. 110, p. 46; Doc. 111, p. 17, ¶ 21).

ended badly for the Cisneys, Mr. Rankin and Mr. Johnson managed to save the Foremost settlement and may have minimized the indemnity recovery for Mr. Cisney's employer's workers compensation carrier because Mr. Rankin and Mr. Johnson added Mrs. Cisney to the settlement when they redid it and asked Foremost to designate half of the settlement fund for Mrs. Cisney. In doing so, the attorneys potentially insulated half of the Foremost settlement from the indemnity claim. (Doc. 111, pp. 8, 11).

Moreover, there is no evidence that a UIM claim was part of Mr. Cisney's original agreement with Mr. Johnson for services. As discussed, Mr. Cisney's contract with Mr. Johnson pertained only to a claim against the parties responsible for Mr. Cisney's accident. The first correspondence between Mr. Cisney and Mr. Rankin concerning a UIM claim took place after Mr. Rankin completed the initial settlement of the third-party tortfeasor claim with Foremost. (Doc. 110, p. 44). Had Mr. Johnson not pursued a UIM claim, Mr. Cisney would have recovered only $50,000 from Mr. Rosales's Foremost insurance policy, and most of that would have been obligated to reimburse Mr. Cisney's employer's workers compensation carrier. Mr. Cisney did not engage Mr. Johnson to do more.

The Cisneys benefitted from Mr. Johnson's effort to obtain UIM benefits on their behalf. Despite the mistakes that Mr. Rankin and Mr. Johnson made, the Cisneys recovered $500,000 from Metlife, which is the full amount of UIM benefits

available under their insurance policy.  (Doc. 112, p. 6).  Mr. Johnson had negotiated with Metlife an arrangement that assured the Cisneys of recovering at least $100,000 in their arbitration with Metlife.  The Cisneys did not lose insurance proceeds because of Mr. Johnson's negligence in handling their case.

Because the Cisneys cannot prove that the legal matter concerning which Mr. Johnson is alleged to have been negligent would have been resolved more favorably to them but for his negligence, they cannot recover on their malpractice claim as a matter of law.  Accordingly, the Court grants Mr. Johnson's motion for summary judgment on the Cisneys' legal malpractice claim.

**CONCLUSION**

For the reasons stated above, the Court enters judgment in favor of Mr. Johnson on the Cisneys' claims for conversion, wantonness, and legal malpractice. The Court denies declares that, as a matter of law, Mr. Johnson may not assert a lien against the Metlife settlement fund pursuant to his contingency fee agreement with Mr. Cisney, but the Court denies summary judgment for both parties with respect to the Cisneys' request for declaratory relief because Mr. Johnson's tort claims under which he seeks a fee recovery remain pending.

The Court asks the Clerk to please TERM Docs. 105 and 107.  The Court sets this matter for a telephone conference on August 31, 2021 at 10:30 a.m. to discuss

the remaining claims in this action.  Counsel of record shall please dial (877) 873-8018 and enter access code 5313999 to participate in the call.

**DONE** and **ORDERED** this August 27, 2021.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE